******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KEVAN SIMMONS
## (AC 37826)

Sheldon, Prescott and Bear, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree, criminal possession of a pistol or revolver and carrying a pistol without a permit in connection with the shooting of the victims, C and H, the defendant appealed to this court. He claimed, inter alia, that the state's grant of immunity to H, in which the state agreed not to prosecute H for any act of perjury he committed while testifying for the state, was plain error that constituted structural error and, thus, warranted a new trial because it violated the public policy reflected in the statutory (§ 54-47a [b]) prohibition against immunizing perjured testimony. The state had granted H immunity in exchange for his testimony after he invoked his fifth and fourteenth amendment privilege against self-incrimination and refused to answer any questions by the state. After the statutory (§ 1-25) oath for testifying witnesses was administered to H, he testified that he could not recall any details of the shooting and did not identify the defendant as the shooter. The state then attempted to impeach H's testimony with a previous statement he had made to his mother during a telephone conversation in which he identified the defendant as the shooter. The trial court admitted H's statement to his mother as a prior inconsistent statement and ruled that the jury could use it only to evaluate H's credibility, but not for substantive purposes. During closing argument to the jury, the prosecutor argued H's statement to his mother should be treated as substantive evidence that the defendant was the shooter. *Held*:

1. The state's promise to H of immunity from prosecution for any perjury he might commit in his testimony plainly violated the strong public policy contained in § 54-47a (b) against immunizing perjured testimony and undermined the perception of and confidence in the system of justice; a fraud was perpetrated on the jurors because, unbeknownst to them, H was permitted to swear to a meaningless oath under § 1-25 that gave his testimony an indicium of reliability that was not present, as the immunity agreement meant he was free to lie without subjecting himself to legal jeopardy, and the record reflected that the trial court and the prosecutor either knew or should have known that the promise of immunity to H was improper.

2. The state's improper grant of immunity to H warranted the exercise of this court's supervisory authority over the due administration of justice, as the dearth of authority on the question of whether the improper grant of immunity constituted structural error, and this court's practice of not deciding thorny constitutional questions when possible, made it unnecessary to decide whether the defendant's constitutional rights were violated by the improper immunity agreement or whether the structural error doctrine was applicable.

3. This court's exercise of its supervisory powers over the administration of justice to remand this case for a new trial made it unnecessary to resolve the difficult and close question of whether the defendant was harmed by H's testimony; although the state's motive in promising H broad and unlawful immunity was unknown, because the state presumably deemed H's testimony necessary to the public interest, it was incongruous for the state to minimize the import of his testimony in order to argue that it was not harmful to the defendant, as the improper promise of immunity to H served as the mechanism to force him to testify, which thereafter presented the state with an opportunity to impeach him with his prior inconsistent statement to his mother and to improperly place that statement before the jury as substantive evidence that the defendant was the shooter.

4. The exercise of this court's supervisory powers over the administration of justice to remand this case for a new trial was warranted under the circumstances here; the state's improper immunity agreement with H gave him a license to commit perjury and, thus, directly implicated the perception of the integrity of the justice system, the existence of the

sanction for perjury plays a critical role in the truth seeking process and helps to secure the defendant's right to confront the witnesses against him, the reversal of the defendant's conviction will help to ensure that such an unlawful promise will not be made by prosecutors in the future, it was necessary to send a clear message to trial courts that they have an affirmative obligation to intercede in circumstances where it appears that the state has offered a witness a license to lie during the trial, and because only the state has the ability to grant immunity to a witness, it is important that courts confine the use of that significant prosecutorial power to appropriate instances that do not further and unfairly disadvantage a defendant.

5. The state's objection to this court's exercise of its supervisory authority to reverse the defendant's conviction was unavailing; it was not unclear that this court has supervisory power over the administration of justice, our Supreme Court having repeatedly stated that appellate courts possess that power, the state's contention that the defendant's inaction at trial regarding the unlawful immunity agreement prevented this court from exercising its supervisory power to remedy such an egregious error on appeal was unavailing, as nothing in the record suggested that the defendant's failure to challenge the propriety of the immunity agreement was due to a conscious trial strategy that amounted to a tactical waiver, and, after balancing all the interests involved, which included the extent of prejudice to the defendant, the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial, the practical problems of memory loss and unavailability of witnesses after much time has elapsed, and the availability of other sanctions, this court was not convinced that it should not exercise its supervisory authority to reverse the defendant's conviction.

(*One judge concurring in part and concurring in the judgment*)

Argued March 20, 2018—officially released March 26, 2019

*Procedural History*

Substitute information charging the defendant with two counts of the crime of assault in the first degree, and with the crimes of criminal possession of a pistol or revolver and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Mullarkey, J.*; verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the court, *Hon. Edward J. Mullarkey*, judge trial referee, granted the defendant's motion for augmentation and rectification of the record. *Reversed; new trial.*

*Laila M. G. Haswell*, senior assistant public defender, with whom, on the brief, was *Lauren Weisfeld*, chief of legal services, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Chris A. Pelosi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. In this criminal case, a witness for the state, George Harris, was promised that he would not be prosecuted for perjury even if he lied during his testimony. The trial court acquiesced to this agreement, despite recognizing that it "is probably against the public interest . . . ." This appeal requires us to decide, under the circumstances of this case, whether the defendant, Kevan Simmons, is entitled to a new trial because of this concededly unlawful promise. For the reasons that follow, we conclude that this error was so egregious in nature that it undermines public confidence in the due administration of justice and that, pursuant to our supervisory powers, the defendant should be granted a new trial.

The defendant appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims, in his initial brief, that the prosecutor committed improprieties during closing argument that deprived him of his right to a fair trial, including, among other things, suggesting to the jury that it could consider as substantive evidence a prior statement of Harris that was admitted at trial only for impeachment purposes, in which he identified the defendant as his assailant. We later granted the defendant permission to file a supplemental brief addressing an additional claim of prosecutorial impropriety, namely, whether the defendant's right to due process was violated by the state's failure to disclose to him, prior to trial, certain exculpatory evidence relevant to the veracity of the detective who took a statement from the defendant. See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

After oral argument before this court, and on the basis of our review of the record, we ordered the parties, sua sponte, to file additional supplemental briefs addressing an unpreserved claim of error not raised by the parties, namely, "(1) whether the state's agreement not to prosecute George Harris for any future acts of perjury committed while testifying for the state at the defendant's trial constituted plain error because it violates the public policy of this state against immunizing perjured testimony; see General Statutes § 54-47a; see also *State* v. *Giraud*, 258 Conn. 631, 634–35, 783 A.2d 1019 (2001); and (2) if so, whether such error was structural error or subject to harmless error analysis." Each party filed a supplemental brief. In its brief, the state conceded that its grant of immunity to Harris was improper. We later asked the parties to submit additional supplemental briefs addressing whether this court should exercise its supervisory authority to

reverse the conviction. Because we exercise our supervisory powers to order a new trial for the defendant on the basis of the improper grant of immunity to Harris, we do not reach the merits of the remaining claims raised by the defendant.[1]

The jury reasonably could have found the following facts. A shooting occurred on Bedford Street in Hartford on March 28, 2013, involving the defendant; Harris, his friend; and Joaquin Cedeno. Specifically, at approximately 9:22 p.m. that day, the defendant and Harris were walking through the Bedford mall, a term commonly used to describe a cluster of apartment buildings on either side of Bedford Street, when they encountered Cedeno standing on the front stoop of an apartment building.

Cedeno and the defendant began arguing. The argument quickly escalated into a physical fight. Harris tried to break up the fight but was unsuccessful. During the fight, the defendant pulled out a gun and pointed it at Cedeno. Cedeno attempted to push the gun away from himself, but the defendant fired several gunshots, hitting both Cedeno and Harris. Cedeno, Harris, and the defendant then all ran from the scene in different directions.

Officer Robert Fogg of the Hartford Police Department, who was working nearby, received a dispatch that gunshots had been fired at 137 Bedford Street. Fogg drove to the location. When he arrived, he found Harris, who had been shot in the leg, lying in an alleyway just south of 137 Bedford Street. Harris did not name his shooter and only told Fogg to relay a message to his mother that he loved her. Harris was taken to a hospital by ambulance.

At 9:36 p.m., Officer Bartosz Kubiak was dispatched to 378 Garden Street, a location close to the scene of the shooting, after someone reported a serious assault with a firearm. When Kubiak arrived, Cedeno was sitting on the front steps of 378 Garden Street. Cedeno's pants, T-shirt, and sweatshirt were stained with blood, and it appeared to Kubiak that Cedeno had been shot several times on the right side of his body. Cedeno did not indicate to Kubiak who had shot him. Cedeno was also transported to a hospital. Kubiak searched the surrounding area for evidence relating to the shooting but did not find a weapon.

Approximately ten minutes after the shooting, the defendant returned to the scene of the shooting on Bedford Street. He approached Fogg, and the two began talking. Fogg knew that the defendant and Harris were friends, so Fogg relayed to the defendant the message Harris had asked Fogg to give to Harris' mother. Fogg also asked the defendant if he had seen anything with respect to the shooting, and the defendant replied that he had not.

On March 30, 2013, two days after the shooting, Detective Christopher Reeder spoke to Harris at the hospital. Harris told Reeder that, on the night of the shooting, he was walking through Bedford mall with a person nicknamed "Ghost" when he heard gunshots and realized he had been shot. He described the shooter as a black male wearing black clothing. Reeder told Harris that the police had video that captured the incident. Harris then rolled over in his hospital bed, sighed, and said, "You ain't even here; do what you gotta do." Harris also told Reeder that he might have seen "Boobie," the nickname of Cedeno, at the shooting.

That same day, Reeder also questioned Cedeno about the shooting. Cedeno described his shooter as a black male of average build, about five feet, eight inches tall, and between twenty and twenty-five years old. Cedeno also told Reeder that, on the night of the shooting, he had been hanging out in Bedford mall when he was approached by the shooter. Cedeno recalled that the two got into an argument, during which the shooter took out a gun and fired it at Cedeno. Cedeno told Reeder that, after the gunfire broke out, he ran through an alleyway between 133 and 135 Bedford Street, and made it to Garden Street before he realized that he had been shot and collapsed.

On April 19, 2013, Harris was arrested on drug charges. After reading Harris his *Miranda*[2] rights, Reeder began to question Harris about the shooting incident on Bedford Street. Harris relayed to Reeder a version of events similar to that which he had given when he was questioned about the shooting in the hospital. Reeder then showed Harris a video comprised of footage recovered from security cameras attached to various apartments on Bedford Street (video) that depicted the shooting. Harris once again pointed out "Ghost" in the video, but did not offer any additional details about the shooting or identify himself on the video.

While incarcerated on the drug charges, Harris made a phone call to his mother, during which he implicated the defendant as his shooter. That call was recorded by the correctional facility.

On May 2, 2013, the defendant was arrested on charges unrelated to the shooting of Harris and Cedeno. That day, Reeder, Detective Renee LaMark-Muir, and Detective Reginald Early interviewed the defendant. Reeder showed the defendant the video of the shooting. Afterward, Early presented the defendant with a statement that he represented to the defendant had been given to the police by Harris. Early, however, had fabricated the entire statement in order to encourage the defendant to confess that he was the shooter on the belief that Harris had already inculpated him. In the fabricated statement, Harris purportedly told the police

that Cedeno had attempted to rob him and the defendant at gunpoint, and that the defendant had shot Cedeno in self-defense. The fabricated statement further provided that the defendant also had shot Harris by accident.[3]

After Early read the fabricated statement to the defendant, he became upset and began crying. Early then began questioning the defendant about the shooting, and the defendant gave a written statement in which he admitted that he had shot Cedeno and Harris. Specifically, the defendant stated that Cedeno had attempted to rob the defendant and Harris, and that the defendant was forced to shoot Cedeno in self-defense but hit Harris, too. The defendant also stated that he had found the gun with which he shot Cedeno and Harris earlier that day near a dumpster and, after the shooting, ran and hid the gun before the police arrived. He stated that he returned to Bedford Street after shooting Cedeno and Harris to make sure that Harris was okay. Finally, the defendant admitted that he was the person depicted in the surveillance video speaking to Officer Fogg after the shooting.

On October 1, 2014, the state filed the operative substitute information, in which it charged the defendant with two counts of assault in the first degree in violation of § 53a-59 (a) (5), and one count each of criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1) and carrying a pistol without a permit in violation of § 29-35 (a). On October 8, 2014, the jury trial began.

On the first day of trial, the state called Harris as a witness during its case-in-chief. Harris' attorney was present and advised Harris to invoke his fifth and fourteenth amendment privilege against self-incrimination. Harris did so and refused to answer any questions by the state. A colloquy then ensued between the court, the state, and defense counsel regarding a potential grant of immunity for Harris.

At that time, the state agreed not to prosecute Harris for any crimes stemming from his involvement in the March 28, 2013 shooting. His attorney rejected the state's offer of immunity as insufficient because if Harris were to testify he could expose himself to federal criminal liability with respect to the Bedford Street shooting incident and might implicate himself in an unrelated shooting in 2011 for which he had just recently been served a warrant. The state represented to the court that it would inquire as to whether it could obtain federal immunity for Harris with respect to his testimony at the defendant's trial. The court then continued Harris' appearance until the next day.

On October 9, 2014, the state again called Harris as a witness. Before Harris testified, the court inquired as to whether the state and Harris had come to an

agreement regarding the grant of immunity. Harris' counsel represented to the court that he believed an agreement had been reached. The following exchange then ensued between defense counsel, the court, and the prosecutor:

"[Harris' Counsel]: And so [the grant of immunity] includes transactional immunity to the events related to the—on the day of the shooting, directly and indirectly. It involves use immunity, so none of his words could be used directly against him in this or any other proceeding in state or federal court or anywhere else. It also includes derivative use so that his words can't be used to investigate and then come up with other evidence that can be used against him in any proceeding. There are other issues that we have talked about that I think need to be addressed.

"The Court: Go ahead.

"[Harris' Counsel]: *One is that the immunity statute does not immunize a witness from committing perjury at the time.*

"The Court: *It does not.*

"[Harris' Counsel]: And my understanding is that there is a tape recording or the prosecuting authority believes that it has a tape recording of my client saying something related to his testimony. So, I have concerns about exposure to perjury, and my understanding is that there has been an agreement that there wouldn't be *any perjury prosecution related to my client's testimony today.*

"[The Prosecutor]: *That's correct,* Your Honor.

"The Court: Okay. Well, [counsel], I must compliment you. I have been in the criminal justice system for forty-two and one-half years. I've never heard of anybody getting that agreement. But it's an agreement the state made. That's their decision. Now, are we ready to testify?"[4] (Emphasis added.)

Fully immunized, Harris was then administered the oath for testifying witnesses by the clerk in the presence of the jury. Although the oath taken by Harris was not transcribed, the required contents of the oath are set forth in General Statutes § 1-25, which provides that the oath administered to witnesses shall be: "You solemnly swear or solemnly and sincerely affirm, as the case may be, that the evidence you shall give concerning this case shall be the truth, the whole truth and nothing but the truth; so help you God or upon penalty of perjury."

Harris then testified that he had been on Bedford Street on the night in question, and had been shot in the leg and hospitalized. He indicated that he and the defendant had been friends for eight years, and that he also knew Cedeno, the other gunshot victim. The state asked Harris a series of additional questions about his recollections from the night he was shot, including who

he was with that night, what he and others were wearing, and whether he knew the identity of the shooter. Harris testified that he could not recall any details of the night he was shot because he had been intoxicated. He also testified that he was unable to identify anyone, including himself, from the videotape of the incident, which the state played for him in court, stopping it at various points to ask questions.[5] He did not name the defendant as his shooter.

The state, however, attempted to impeach Harris' testimony that he did not know the identity of his shooter by questioning him about the May 6, 2013 telephone call he made to his mother while he was incarcerated, during which he identified the defendant as the person who shot him. After establishing that he had signed a consent form when he was incarcerated acknowledging that his telephone calls would be recorded, the state asked Harris if he had talked to his mother about this case. In particular, the prosecutor asked him if he had told his mother that he was not going to cooperate with the police because he believed that he could only receive a thirty day sentence for refusing to testify, the defendant was in a holding cell nearby, and the police had shown him a videotape of "this nigga shooting at me and this dude." He repeatedly responded that he could not remember what he had told his mother, including whether he had told her that he could identify both himself and the defendant in the surveillance videotape he was shown by the police. At this point, the jury was excused so that the state could play the recording of the telephone call for the witness in an attempt to refresh his recollection.

Outside the presence of the jury, the following colloquy between the court and the prosecutor about the immunity agreement ensued during a discussion of the admissibility of the call from Harris to his mother:

"[The Prosecutor]: The state will be offering [the recording of the telephone call] as a prior inconsistent statement by Mr. Harris. Now, if Mr. Harris—

"The Court: Well, are you sure that he does not have early onset dementia? Because for a young man, his memory's shot.

"[The Prosecutor]: Well, this is the way you could refresh his memory, Your Honor.

"The Court: Well, *you're the one who agreed not to prosecute him for perjury.*

"[The Prosecutor]: I agree.

"The Court: *Which is probably against the public interest*, but I didn't step in.

"[The Prosecutor]: There's a lot of issue with public interest in this case.

"The Court: I must say *this amount of perjury* actu-

ally offends me." (Emphasis added.)

Harris was then questioned before the jury about what he had said to his mother during the prison phone call. After Harris denied having told his mother that he could identify himself and the defendant in the videotape he had been shown by the police and that he could not remember making such a statement, portions of the audiotaped recording of the phone call were played to the jury without objection.

After the state had completed its direct examination of Harris, the court gave the jury the following instruction: "Ladies and gentlemen, just as I gave you the instruction a few minutes ago on prior misconduct by a witness, evidence has been presented through this witness that statements made outside the court are inconsistent with some of his trial testimony. You should consider that out-of-court evidence only as it relates to his credibility. It's not substantive evidence. In other words, you consider it evidence as you would any other evidence inconsistent with his conduct in determining the weight to give to his testimony in court."

Despite the court's instruction that the phone call between Harris and his mother could not be used for substantive purposes, the prosecutor, during closing argument, drew the jury's attention to specific portions of that phone call, arguing as follows: "One point *in his testimony* that he's talking to his mom: First, I think I am being charged with everything [the defendant] is. Cop told me the warrant is for not cooperating, and I'm like, yeah, I'll take that. Makes sense. If you woulda seen the video they showed me, I coulda got charged with the same thing he got charged with. They showed me the video. When they first showed me the video, I'm telling them: I don't know who that is. That's why they saying I won't cooperate. I'm like, that's me. That's Boobie. I don't know who that is. He like, who's that? That's Ghost. That's Ghost. They showed everything. When I sat down, when I couldn't move, they showed [the defendant] walked up to me. Then they showed him run off. Then they show this girl run out, tie my leg up. They showed the whole thing.

"They smacked him with the charges right there. He testified that they're arrested at the same time, that they were at [the] Hartford lockup at the police department, and they were placed in cells next to each other. They smacked him with the charges right there. They had us together. They really put us together and this 'n' shot me. They just got us together. They don't care. And then he laughs. I'm in a holding cell. I don't know how he seen me. I'm asleep. He seen me. They put him in a cell like two cells down. It's like, one, two in the morning. All I hear is: George. George. Come on, man. I know you hear me. I know you hear me. I just seen you. I just seen you. I'm like, this 'n' really trying to

talk to me? I'm in jail 'cause of him right now 'cause he shot me in the leg.

"*That's testimony, ladies and gentlemen.* That's not given to police or the state's attorney's office. Now, I'm going to—now, that's another factor, as I said. [The defendant]—*Mr. Harris places him at the scene as the shooter.*" (Emphasis added.) Thus, the state attempted to make substantive use of Harris' recorded phone call to his mother despite the fact that the court had admitted it only for impeachment purposes and not for the truth of any of Harris' statements made during the phone call.

On October 14, 2014, the jury returned a verdict of guilty on all counts of the operative substitute information. On January 6, 2015, the court sentenced the defendant to twenty-three years of incarceration followed by ten years of special parole. This appeal followed. Additional facts and procedural history will be set forth as necessary.

The defendant claims that the state's agreement not to prosecute Harris for any act of perjury he committed while testifying for the state during the defendant's trial constituted plain error because it clearly violated a public policy against immunizing perjured testimony. This improper grant of immunity, the defendant contends, constitutes structural error that obviates the need to engage in harmless error analysis and warrants a new trial. In the alternative, the defendant argues that, if harmless error analysis applies, the state has failed to meet its burden to show that the error was harmless beyond a reasonable doubt. Finally, the defendant argues that we should exercise our supervisory authority over the administration of justice to reverse his conviction and order a new trial.

The state contends that, although there was error, that error was not structural in nature and did not cause the defendant manifest injustice. Additionally, the state argues that this court should not exercise its supervisory powers over the administration of justice to reverse the conviction and order a new trial.

Although we ultimately decide to reverse the defendant's conviction and order a new trial pursuant to our supervisory authority, it is, in our view, helpful to discuss the question of structural error and harm to explain why we choose to resolve the case by resort to our supervisory powers rather than by employing the structural error doctrine or through an evaluation of harm to the defendant. See *State* v. *Rose*, 305 Conn. 594, 606–607, 46 A.3d 146 (2012).

I

We begin with a discussion of the plain error doctrine. It is axiomatic that an unpreserved claim of error, i.e., one that was neither distinctly raised before nor decided by the trial court, may be considered pursuant to the

plain error doctrine. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], [our Supreme Court] described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–78, 60 A.3d 271 (2013).

The state concedes that its improper immunity agreement with Harris violated the first prong of the plain error doctrine because the error is discernible on the face of a factually adequate record. Perhaps more significantly, the record reflects that the trial court and the prosecutor either knew or should have known that the promise of immunity to Harris by the state was improper[6] and yet, the court permitted Harris to testify pursuant to an unlawful agreement that he could not

be prosecuted for perjury even if he lied during his testimony. Despite the state's concession, it is important for us to explicate fully the reasons why such an agreement violates public policy and undermines confidence in our judicial system.

"[A] primary function of a criminal trial is to search for the truth. . . . The trial court has a duty to preside at a trial and to take appropriate actions, when necessary, that promote truth at a trial." (Citation omitted.) *State* v. *Kirker*, 47 Conn. App. 612, 617, 707 A.2d 303, cert. denied, 244 Conn. 914, 713 A.2d 831 (1998); see also *State* v. *Mendoza*, 119 Conn. App. 304, 321, 988 A.2d 329 (court required "to balance the defendant's interest in a fair proceeding with a trial's fundamental and ever present search for the truth"), cert. denied, 295 Conn. 915, 990 A.2d 868 (2010); *Riley* v. *Goodman*, 315 F.2d 232, 234 (3d Cir. 1963) ("We have long abandoned the adversary system of litigation which regards opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed. . . . A trial is not a contest but a search for the truth so that justice may properly be administered." [Citation omitted.]).

"From ancient times it has ever been held essential that witnesses in court proceedings swear or affirm before giving evidence." (Internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 153, 496 A.2d 476 (1985). Our statute criminalizing perjury plays a critical role in the search for the truth at trial because it significantly deters a witness who takes an oath or an affirmation from testifying falsely at a time when the witness' testimony will significantly impact the rights of a defendant. See General Statutes § 53a-156 (a); *Maryland* v. *Craig*, 497 U.S. 836, 845–46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1989) (confrontation clause "insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury" [internal quotation marks omitted]);[7] *State* v. *Tye*, 248 Wis. 2d 530, 540–41, 636 N.W.2d 473 (2001) ("[t]he purpose of an oath or affirmation is to impress upon the swearing individual an appropriate sense of obligation to tell the truth . . . by creating liability for perjury" [footnotes omitted]); 58 Am. Jur. 2d 884–86, 888–89, Oath and Affirmation §§ 1, 5 and 6 (2012).

Section 54-47a sets forth the requirements regarding the grant of immunity to a witness who has refused to testify pursuant to his privilege against self-incrimination guaranteed by the fifth and fourteenth amendments to the United States constitution. Section 54-47a (a) provides in relevant part that "[w]henever in the judgment of the Chief State's Attorney, a state's attorney or the deputy chief state's attorney, the testimony of

any witness . . . in any criminal proceeding involving . . . felonious crimes of violence . . . *is necessary to the public interest,* the Chief State's Attorney, the state's attorney, or the deputy chief state's attorney, may, with notice to the witness, after the witness has claimed his privilege against self-incrimination, make application to the court for an order directing the witness to testify or produce evidence subject to the provisions of this section." (Emphasis added.)

Section 54-47a (b) provides in relevant part that "[u]pon the issuance of the order such witness shall not be excused from testifying . . . on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify or produce evidence, and no testimony or evidence so compelled, and no evidence discovered as a result of or otherwise derived from testimony or evidence so compelled, may be used as evidence against him in any proceeding, *except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony or producing such evidence* . . . ."[8] (Emphasis added.)

In *State* v. *Giraud,* supra, 258 Conn. 634–38, our Supreme Court considered a related immunity issue. Specifically, the defendant in *Giraud* claimed that the trial court improperly had failed to grant a defense witness immunity from prosecution. Id., 634. Prior to that witness being sworn, the defendant had moved that the state be compelled to grant the witness immunity with respect to his testimony, "with the exception [of] any perjury committed by him . . . ." (Internal quotation marks omitted.) Id. In rejecting the defendant's claim, our Supreme Court noted that "[t]he request did not distinguish between perjury committed before [the witness] was granted immunity and perjury committed by him when testifying after such a grant of immunity. *Immunity, of course, may not be a license to lie while giving immunized testimony.*" (Emphasis added; internal quotation marks omitted.) Id., 634–35. Similarly, the Supreme Court of the United States has consistently held that grants of immunity cannot extend to future perjurious testimony given by a witness—i.e., perjury committed during the course of the immunized testimony. See *United States* v. *Apfelbaum,* 445 U.S. 115, 127–30, 100 S. Ct. 948, 63 L. Ed. 2d 250 (1980); see also *Glickstein* v. *United States,* 222 U.S. 139, 143, 32 S. Ct. 71, 56 L. Ed. 128 (1911) (testimony given under a license to commit perjury is not "testimony in the true sense of the word").

In the present case, it is undisputed that the immunity obtained by Harris included immunity from prosecution for *any* perjury that Harris might commit while testi-

fying as a witness for the state against the defendant. The state promised immunity to overcome Harris' invocation of his fifth and fourteenth amendment privilege against self-incrimination and to force him to testify. The promise plainly violated the strong public policy that is reflected in the statutory prohibition contained in § 54-47a (b).[9]

A jury is entitled to assume that the statements of a witness who testifies at trial "carr[y] the sanction of the oath which [he or] she ha[s] taken . . . ." *Ruocco* v. *Logiocco*, 104 Conn. 585, 591, 134 A. 73 (1926). In the present case, the transcript of the proceedings indicates that Harris was sworn in by the clerk in the presence of the jury. Without any knowledge of the improper immunity agreement, the jury presumably believed that Harris was testifying under the sanction of the oath that he took "upon the penalty of perjury." General Statutes § 1-25. Unbeknownst to the jury, however, his oath had no significance because Harris knew that the immunity agreement meant he was free to lie without subjecting himself to legal jeopardy. In other words, a fraud was perpetrated on the jurors by permitting Harris to swear to a meaningless oath that gave his testimony an indicium of reliability that was not in fact present. In sum, the improper grant of immunity violates public policy and undermines the perception of and confidence in our system of justice.

## II

Having explained why the grant of immunity in this case violates public policy, we next turn to the question of whether this impropriety constitutes structural error that obviates the need to engage in harmless error analysis to determine whether the defendant suffered a manifest injustice. The state contends that the improper grant of immunity does not constitute a structural error that would excuse the defendant from establishing that it caused a manifest injustice to him because the harm suffered by the defendant, if any, is not "unquantifiable or indeterminate" and was not of "such pervasiveness or magnitude" to rise to the level of structural error.

This question appears to be a matter of first impression, as our research has not revealed any reported cases addressing it.[10] The United States Supreme Court recently set forth a comprehensive discussion of the structural error doctrine: "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it affect[s] the framework within which the trial proceeds, rather than being simply an error in the trial process itself. . . . For the same reason, a structural error def[ies] analysis by harmless error standards. . . .

"The precise reason why a particular error is not

amenable to that kind of analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error. There appear to be at least three broad rationales.

"First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest. This is true of the defendant's right to conduct his own defense, which, when exercised, usually increases the likelihood of a trial outcome unfavorable to the defendant. . . . That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty. . . . Because harm is irrelevant to the basis underlying the right, the Court has deemed a violation of that right structural error. . . .

"Second, an error has been deemed structural if the effects of the error are simply too hard to measure. For example, when a defendant is denied the right to select his or her own attorney, the precise effect of the violation cannot be ascertained. . . . Because the government will, as a result, find it almost impossible to show that the error was harmless beyond a reasonable doubt . . . the efficiency costs of letting the government try to make the showing are unjustified.

"Third, an error has been deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. See *Gideon* v. *Wainwright*, 372 U.S. 335, [343–45], 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (right to an attorney); *Sullivan* v. *Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (right to a reasonable-doubt instruction). It therefore would be futile for the government to try to show harmlessness.

"These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural. . . . For these purposes, however, one point is critical: An error can count as structural *even if the error does not lead to fundamental unfairness in every case.* See [*United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 149 n.4, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006)] (rejecting as inconsistent with the reasoning of our precedents the idea that structural errors always or necessarily render a trial fundamentally unfair and unreliable . . . [citations omitted; internal quotation marks omitted]).[11] *Weaver* v. *Massachusetts*, U.S. , 137 S. Ct. 1899, 1907–1908, 198 L. Ed. 2d 420 (2017); see also *State* v. *Latour*, 276 Conn. 399, 410–12, 886 A.2d 404 (2005); *State* v. *Lopez*, 271 Conn. 724, 733–34, 859 A.2d 898 (2004).

On one hand, the error in this case reasonably can be characterized as affecting the structural integrity of the entire trial. Permitting the testimony at a criminal trial of even a single witness who does not face the sanction of a prosecution for perjury undermines the truth seeking purpose of a trial. On the other hand, the error in this case, while egregious in nature, was related directly to a single witness who testified during a distinct portion of the trial and did not necessarily affect the entire proceeding.

The error here does not fall within the first general category of structural errors because it does not implicate a right, similar to the defendant's right to conduct his own defense, that is separate and distinct from legal protections that are designed to protect against erroneous convictions. Moreover, the second category of structural error, i.e., those errors the effect of which are simply too difficult to measure, is not applicable because there may be instances in which the effect of the improper grant of immunity on the verdict is measurable and quantifiable. For purposes of illustration, imagine a case in which twenty-five witnesses identify the defendant as the perpetrator but one of the witnesses testifies after having been given immunity from a perjury prosecution for his testimony. In such a scenario, a reviewing court could reasonably conclude that, in light of the testimony of the twenty-four other witnesses, the testimony of the one improperly immunized witness was harmless beyond a reasonable doubt and did not cause the defendant to suffer a manifest injustice.

Indeed, we are aware that, at first blush, the unlawful immunity agreement in the present case appears analogous to instances in which a witness testifies at trial without properly having been sworn in through the administration of an oath. Under existing federal jurisprudence, testimony by an unsworn witness is not considered structural error and, in fact, courts have deemed such claims of error forfeited if not raised before the trial court. See, e.g., *United States* v. *Watson*, 611 Fed. Appx. 647, 661–62 (11th Cir. 2015), cert. denied, U.S.    , 136 S. Ct. 1212, 194 L. Ed. 2d 215 (2016). Although the two errors are similar because both involve testimony given by a witness unencumbered by the legal sanction of an oath, the situation in the present case involves a far more insidious error, warranting a different analysis. The failure to swear in a witness arising in these federal cases presumably is the product of inadvertence. Furthermore, the error typically occurs in the presence of the jury, which may be aware that the oath was not given and can evaluate the unsworn testimony accordingly. In the present case, by contrast, the jury was deceived into believing that Harris was testifying under the penalty of perjury.

The error in this case is more akin to those arising

in the third category of structural errors, i.e., those errors, such as the failure to give a reasonable doubt instruction, that always result in fundamental unfairness to a defendant. The defendant's sixth and fourteenth amendment right to confront the witnesses against him is vitiated in circumstances in which a witness does not testify under the penalty of perjury.[12] As the United States Supreme Court stated in *Maryland* v. *Craig*, supra, 497 U.S. 836, "[t]he central concern of the [c]onfrontation [c]lause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of adversary proceeding before the trier of fact. . . . [T]he right guaranteed by the [c]onfrontation [c]lause includes not only a personal examination [of the witness], but also . . . insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury . . . ." (Citations omitted; internal quotation marks omitted.) Id., 845–46.

In light of the dearth of authority on the question of whether the error in this case is structural in nature, and consistent with our practice of not deciding thorny constitutional questions when possible, we conclude that it is unnecessary to decide whether the defendant's constitutional rights were violated by the improper immunity agreement or whether the structural error doctrine applies in this case. Instead, for the reasons we will set forth in part IV of this opinion, we choose to exercise our supervisory powers over the administration of justice to order a new trial in this case.

Indeed, our Supreme Court has taken a similar approach in several cases. In *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005), our Supreme Court declined to decide whether principles of double jeopardy required an appellate court to adjudicate the defendant's insufficiency of the evidence claim before addressing the defendant's other claims on appeal. Instead, the court in *Padua*, exercising its supervisory powers, concluded that it was appropriate to impose a rule requiring review of insufficiency of the evidence claims first, even in the absence of a conclusion that the defendant's constitutional rights would be violated otherwise. Id.; see also *State* v. *Coleman*, 242 Conn. 523, 534, 700 A.2d 14 (1997) (exercising supervisory powers in lieu of deciding state constitutional claim).

In *State* v. *Rose*, supra, 305 Conn. 607–14, our Supreme Court exercised its supervisory powers to reverse the conviction of a defendant and order a new trial because the trial court had compelled the defendant to wear identifiable prison clothing during his jury trial. In doing so, the Supreme Court eschewed the need to determine whether the trial court's actions constituted structural error or whether the defendant was prejudiced under the circumstances of the case. Simi-

larly, for the reasons we will discuss in this opinion, we conclude that the error in the present case warrants an exercise of our supervisory authority over the due administration of justice, making it unnecessary to decide whether the error is structural in nature.

### III

The question of whether the defendant suffered a manifest injustice as a result of the state's improper promise of immunity to Harris is equally as thorny as the question of structural error. Although the state readily concedes that the immunity agreement was improper, it contends that the defendant is not entitled to relief under the plain error doctrine because the defendant cannot establish that he was harmed by the agreement in light of the fact that Harris' testimony did not inculpate the defendant. Specifically, the state argues that Harris' testimony did not harm the defendant because "Harris did not testify that the defendant shot him or Cedeno," but instead "testified that he did not know who shot him because he had been intoxicated during the events and so did not remember them." Thus, in the state's view, the error did not cause grievous consequences to the defendant resulting in manifest injustice to him.

We first note that the state and the defendant disagree about which party bears the burden of persuasion with respect to the question of harm. Citing *State* v. *Fagan*, supra, 280 Conn. 87, and *State* v. *Johnson*, 178 Conn. App. 490, 496, 179 A.3d 780 (2017), cert. denied, 328 Conn. 905, 178 A.3d 390 (2018), the state contends that, pursuant to the plain error doctrine, the defendant always maintains the burden of establishing that he suffered a manifest injustice because of the error. The defendant asserts that the unlawful immunity agreement violated his constitutional rights and thus the state bears the burden of establishing that the error was harmless beyond a reasonable doubt. According to the defendant, he is entitled to a new trial " 'if there is any likelihood' " that Harris' testimony could have affected the verdict. In support of this contention, the defendant relies on cases in which reviewing courts have imposed this high burden on the state because of a prosecutor's knowing use of perjured testimony in obtaining the conviction.[13] See, e.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 371–73, 71 A.3d 512 (2013).

In addition to the difficulty of deciding which party bears the burden of persuasion on the question of harm; see footnote 13 of this opinion; we note that the issue of whether the defendant was in fact harmed by Harris' testimony is also a difficult one. Because Harris did not identify the defendant as the shooter at trial, his testimony, even if perjurious, should not have been used by the jury as evidence that the defendant was the shooter. It is well established that disbelief of a

witness is not the equivalent of proof. *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985) ("[w]hile it is true that it is within the province of the jury to accept or reject a [witness'] testimony, a jury in rejecting such testimony cannot conclude that the opposite is true" [internal quotation marks omitted]). Thus, even if the jury found incredible Harris' testimony that he did not know who shot him, a conclusion that Harris was lying is not substantive evidence that the defendant was the shooter.[14]

On the other hand, if the state had been unsuccessful in forcing Harris to take the witness stand, it would never have had the opportunity to impeach him with his prior inconsistent statement to his mother, in which he identified the defendant as the shooter. Although this statement was admitted by the court only to assess the credibility of his testimony at trial that he did not know the identity of the shooter, the state, during closing argument, argued to the jury that it should treat his statement to his mother as substantive evidence that the defendant was the shooter. In other words, the state's improper promise of immunity served as the mechanism to force Harris to testify, which ultimately presented the state an opportunity to place before the jury, albeit improperly, Harris' statement that the defendant was the shooter.[15]

We do not know the state's precise motive in promising Harris such broad and unlawful immunity. It is conceivable that the state believed that if it could force Harris to testify, he simply would "change his tune" and identify the defendant as the person who shot him and Cedeno. It is also possible that the state was determined to force Harris to take the witness stand in the belief that he would testify, consistently with his prior statement to the police, that he could not identify the shooter or that he could not remember who shot him. This testimony would then permit the state to impeach Harris with his prior inconsistent statement to his mother that the defendant had shot him. Finally, the state simply may have wanted to call Harris to paint him as an obstructionist (as the state argued in closing argument) so that the jury (1) would not be left to speculate as to why the state had failed to call him— an obvious eyewitness to, and victim of, the shooting— at trial, or (2) would not infer that, as a missing witness, his testimony would have been unfavorable to the state. Regardless of the state's motive, however, forcing Harris onto the witness stand was important enough to the state's case against the defendant that the state made considerable efforts to immunize Harris in exchange for his testimony, which it presumably deemed "necessary to the public interest . . . ." General Statutes § 54-47a. It is incongruous for the state now to minimize the import of Harris' testimony in order to argue that the defendant was not harmed by it.

Again, as with the question of structural error, we find it unnecessary to resolve the difficult and close question of prejudice because we conclude that it is appropriate to exercise our supervisory powers over the administration of justice and to remand the case for a new trial. See *State* v. *Rose*, supra, 305 Conn. 606–607.

IV

It is well settled that "[a]ppellate courts possess an inherent supervisory authority over the administration of justice." (Internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010); see also *State* v. *Rose*, supra, 305 Conn. 607. "Generally, cases in which we have invoked our supervisory authority for rule making have fallen into two categories. . . . In the first category are cases wherein we have utilized our supervisory power to articulate a procedural rule as a matter of policy, either as [a] holding or dictum, but without reversing [the underlying judgment] or portions thereof. . . . In the second category are cases wherein we have utilized our supervisory powers to articulate a rule *or otherwise take measures necessary to remedy a perceived injustice* with respect to a preserved or unpreserved claim on appeal. . . . In other words, in the first category of cases we employ only the rule-making power of our supervisory authority; in the second category we employ our rule-making power *and* our power to reverse a judgment. . . .

"[T]he salient distinction between these two categories of cases is that in one category we afford a remedy and in the other we do not. . . . In the second category of cases, where we exercise both powers under our supervisory authority, the party must establish that the invocation of our supervisory authority is truly necessary because [o]ur supervisory powers are not a last bastion of hope for every untenable appeal. . . . In almost all cases, [c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the [appellant] and the integrity of the judicial system. . . . [O]nly in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts will we exercise our supervisory authority to reverse a judgment. . . . In such a circumstance, the issue at hand, while not rising to the level of a constitutional violation, *is nonetheless of* [*the*] *utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.*" (Citations omitted; emphasis altered; internal quotation marks omitted.) *In re Daniel N.*, 323 Conn. 640, 646–48, 150 A.3d 657 (2016).

Furthermore, "[a]n appeals court may . . . raise the question of whether to use its supervisory powers sua sponte," and "concerns regarding unfair surprise and inadequate argumentation can be alleviated by an order

requiring the parties to file supplemental briefs." *State* v. *Elson*, 311 Conn. 726, 766, 91 A.3d 862 (2014).

Although "we normally exercise this power with regard to the conduct of judicial actors"; *State* v. *Lockhart*, supra, 298 Conn. 576; and often have invoked our supervisory authority to mandate "rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process"; (internal quotation marks omitted) *State* v. *Rose*, supra, 305 Conn. 607; we have rejected any arbitrary and categorical limitations on our use of our supervisory authority. Id. We have also invoked this power to reverse criminal convictions tainted by significant prosecutorial impropriety, particularly in instances when "the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003), quoting *State* v. *Reynolds*, 264 Conn. 1, 165, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). In such cases, our standards for invoking our supervisory powers "are flexible and are to be determined in the interests of justice." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 451, 797 A.2d 1088 (2002). Moreover, reversal of the conviction does not necessarily serve the purpose of remedying any particular harm to the defendant in the case before the court, but ensures that the improper behavior is not repeated in the future. Id.; *State* v. *Rose*, supra, 611–12.

*Rose* is a direct example of the use of supervisory authority to order a new trial even in the absence of a showing that the defendant was harmed by the error or that the error was structural in nature. In *Rose*, our Supreme Court granted the state's petition for certification to appeal from this court's decision to reverse a criminal conviction in which the trial court had compelled the defendant to appear for trial in identifiable prison clothing. Certification initially was granted as to the following questions: "Did the Appellate Court properly determine that harmless error analysis does not apply where the trial court has compelled the defendant to appear before a jury in identifiable prison garb? If not, was the defendant's appearance before the jury in identifiable prison garb harmless beyond a reasonable doubt?" *State* v. *Rose*, 290 Conn. 920, 966 A.2d 238 (2009).

After hearing argument, the court asked the parties to file supplemental briefs addressing "[w]hether this court should affirm the judgment of the Appellate Court on the [alternative] ground that reversal of the defendant's conviction is warranted in the exercise of this court's inherent supervisory authority over the administration of justice." (Internal quotation marks omitted.) *State* v. *Rose*, supra, 305 Conn. 604–605. The state argued that, if the court exercised its supervisory

authority, it should do so only to issue a prospective rule and that it should reinstate the defendant's conviction. Id., 605.

The Supreme Court, however, elected to exercise its supervisory authority to reverse the defendant's conviction and order a new trial, and declined to reach the issue of whether the defendant had suffered any prejudicial harm. The court stated: "Because we decide this case on the basis of our supervisory authority, we need not resolve the issue of whether a trial court's constitutionally erroneous decision to compel a defendant to stand trial before a jury in identifiable prison clothing is susceptible to harmless error analysis, as the state claims, or instead amounts to structural error, as the defendant contends and as the Appellate Court apparently concluded." Id., 606. Similar to the present case, the court chose to use its supervisory authority to order a new trial while avoiding the need to determine whether the error that occurred resulted in harm to the particular defendant. "Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also *for the perceived fairness of the judicial system as a whole*." (Emphasis added; internal quotation marks omitted.) Id., 607.[16]

In the present case, we conclude that it is appropriate to exercise our supervisory powers over the administration of justice and to remand this case for a new trial for several reasons. First, the improper immunity agreement directly implicates the perception of the integrity of our justice system. The improper immunity agreement, which plainly violates our public policy, gave Harris a license to commit perjury. Historically, perjury has been characterized as a crime *against the due administration of justice*. In fact, § 53a-156 (a), which criminalizes perjury, is codified at part XI of chapter 952 in our Penal Code, which is titled: "Bribery, Offenses Against the Administration of Justice and Other Related Offenses." As one legal scholar has written: "In time perjury developed into a [crime] . . . including everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud. . . . [T]he gist of the offense is the abuse of public justice, and *not the injury to an individual*. It does not matter whether the false oath was believed or disbelieved, or *whether it caused any injury to the person against whom it was given*." (Emphasis added; footnotes omitted; internal quotation marks omitted.) H. Silving, "The Oath: I," 68 Yale L.J. 1329, 1388 (1959).

Second, as discussed previously, the existence of the sanction for perjury plays a critical role in the truth seeking process and helps to secure the defendant's right to confront the witnesses against him. *Maryland*

v. *Craig*, supra, 497 U.S. 845–46; *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 153. It is difficult to imagine an error that strikes more directly at the truth seeking process that is at the core of our judicial system than an agreement, implicitly endorsed by the court, that permits a witness to testify with a license to lie.

Third, the reversal of the conviction will help to ensure that such an unlawful promise will not be made by prosecutors in the future. In this case, there can be no doubt that the prosecutor knew that such an immunity agreement was prohibited by § 54-47a because the statute is cited in the immunity agreement that was formally filed with the trial court.[17] That knowledge, by itself, was insufficient to deter the state from promising Harris a form of immunity plainly prohibited by the statute. The decision to offer such an unlawful promise was not made in the heat of battle, like a brief improper remark during closing argument, but was reached as part of an extensive negotiation between the state and Harris' attorney that occurred over parts of at least two days.

Fourth, the exercise of our supervisory authority is also necessary to send a clear message to our trial courts that they have an affirmative obligation to intercede in circumstances where it appears that the state has offered a witness a license to lie during the trial. Indeed, the trial court here realized that the agreement violated public policy and believed that the witness was committing perjury but did nothing to prevent it.

Finally, it is important to remember that the ability to grant immunity to a witness is a power that belongs only to the state and is not shared by the defendant. The defendant cannot compel witnesses who have concerns about exposing themselves to criminal liability to testify, even if the defendant believes that their testimony may be exculpatory to him. Thus, it is important that courts confine the state's use of this significant prosecutorial power to appropriate instances that do not further and unfairly disadvantage a defendant.

The state objects to this court exercising its supervisory authority to reverse the defendant's conviction for several reasons. The state contends that it is "unclear" whether the Appellate Court even has the authority to exercise supervisory powers over the administration of justice. The state also argues that this court should not exercise this power sua sponte because the defendant, in essence, through his inaction, waived any challenge to the improper immunity agreement. Finally, the state asserts that the balancing of all of the interests in this case militates against the use of our supervisory powers. We disagree with each of these assertions.

First, this court disagrees with the state that the Appellate Court lacks supervisory power over the administration of justice. Our Supreme Court, in refer-

ring to the supervisory power over the administration of justice, has repeatedly stated that "[a]ppellate court*s*" possess that power, not just our Supreme Court itself. See, e.g., *State* v. *Elson*, supra, 311 Conn. 768; *State* v. *Lockhart*, supra, 298 Conn. 576. More significantly, this court has exercised such powers in the past. See *State* v. *Santiago*, 143 Conn. App. 26, 48–51, 66 A.3d 520 (2013) (exercising supervisory authority to reverse conviction).[18] Although our review of briefs filed by the state in recent appeals reveals that the state repeatedly has taken the position that this court should not exercise its supervisory powers when requested to do so for prudential reasons in a variety of contexts; see, e.g., *State* v. *Dijmarescu*, 182 Conn. App. 135, 158, 189 A.3d 111, cert. denied, 329 Conn. 912, 186 A.3d 707 (2018); *State* v. *Castillo*, 165 Conn. App. 703, 729, 140 A.3d 301, aff'd, 329 Conn. 311, 186 A.3d 672 (2018); *State* v. *Fuller*, 158 Conn. App. 378, 391, 119 A.3d 589 (2015); our research has not revealed any case in which our authority to do so has been challenged. We also reject the state's argument that our Supreme Court's recent decision in *State* v. *Castillo*, 329 Conn. 311, 334–35, 335 n.11, 186 A.3d 672 (2018), has raised doubt about this court's supervisory powers. In *Castillo*, the Supreme Court was never asked to address the existence or scope of the Appellate Court's supervisory authority, and any language employed by the court in a footnote explaining why it had reformulated the third certified question in that case is simply taken out of context.[19] See id., 335 n.11.

Second, we are not persuaded by the state's assertion that it is improper to exercise our supervisory powers sua sponte because the defendant waived any challenge to the illegal immunity agreement by remaining silent during the colloquy among the court, the state, and Harris' attorney. Although the trial judge remarked during this initial colloquy that in his forty-two and one-half years of experience in the criminal justice system, he had "never heard of anybody getting that agreement," the defendant simply failed to object to Harris' testimony. We are not convinced, however, that the defendant's failure to challenge the propriety of the immunity agreement was due to a conscious trial strategy that amounts to a tactical waiver. Nothing in the record before us supports such a conclusion. Although, as indicated, defense counsel was present for the discussions about Harris' immunity agreement with the state, and voiced no objection to the agreement despite the court's skeptical response, we would have to resort to impermissible speculation to determine that defense counsel's inaction was the result of tactical calculation rather than inadvertence. Indeed, the defendant had no way to know with certainty that Harris' testimony would be favorable to him. Although the defendant may have hoped that Harris would not implicate him in the shooting and would disavow or explain

away the recorded statement to his mother, it was also possible that, with the broad grant of immunity, Harris might feel free to implicate the defendant as the shooter. Furthermore, although the defendant cross-examined Harris about his inability to identify anyone on the surveillance videotape and relied to some degree on Harris' testimony during his closing argument, defense counsel did not go to such lengths to exploit Harris' testimony as to suggest a tactical waiver.

The state, moreover, seems to confound the issue of implied waiver with a mere failure to object. Ordinarily, some affirmative action on the part of a defendant is needed before an appellate court will conclude that a defendant waived his right to seek appellate review. For example, by voluntarily and knowingly entering a guilty plea, a defendant waives his right to raise any nonjurisdictional claims of error. See, e.g., *Savage* v. *Commissioner of Correction*, 122 Conn. App. 800, 802–803, 998 A.2d 1247 (2010). The court did not ask the defendant for input as to the propriety of the agreement, and the defendant took no affirmative position on the agreement that could be construed as an express or implied waiver of his right to challenge it. Except in the limited circumstances of challenges to jury instructions; see *State* v. *Kitchens*, 299 Conn. 447, 469–70, 10 A.3d 942 (2011); we have not treated a defendant's inaction or failure to object to constitute an implied waiver that precludes the opportunity for appellate review. Indeed, even in that context, the Supreme Court has indicated that a defendant still may be entitled to relief on an unpreserved claim of instructional error pursuant to the plain error doctrine. *State* v. *McClain*, 324 Conn. 802, 808, 155 A.3d 209 (2016).

Accordingly, we reject the state's contention that the defendant's inaction at trial regarding the unlawful immunity agreement prevents us from exercising our supervisory power to remedy such an egregious error on appeal.

Finally, we are mindful, of course, as the state notes, that "our supervisory authority is not a form of free-floating justice, untethered to legal principle." (Internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997). Our Supreme Court has cautioned that, before we exercise our supervisory powers to reverse a criminal conviction, we must consider and balance all interests involved, including "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) Id. Having considered these and other factors raised by the state, we are unconvinced that, on balance, they require us not to exercise our

supervisory authority under the present circumstances.

First, as we already discussed in detail in part III of this opinion, there is a strong argument that the defendant was unfairly prejudiced by the illegal grant of immunity to Harris. The state's improper immunization of Harris served as the mechanism to force Harris to testify, which allowed the state to introduce to the jury Harris' prior statement identifying the defendant as the shooter. The impact on the defendant was then compounded by the state's improper use of the statement as substantive evidence during closing arguments.

Second, the potential that a new trial would result in significant "emotional trauma to the victims," as claimed by the state, seems unlikely. Certainly, both Harris and Cedeno suffered serious injuries in this case. Retrial of this case, however, will not involve the viewing of graphic and disturbing crime scene or autopsy photographs as one might expect in a more serious homicide case. Nor will a retrial require anyone to describe details of a highly personal nature, as in cases involving a sexual assault. It also does not involve a particularly sensitive victim such as a child. Further, Harris and Cedeno's claimed lack of memory of the events and their purported reluctance to aid authorities in bringing their assailant to justice undermines any assertion that a retrial would result in any grave emotional retraumatization to them.

Third, although practical problems like memory loss and the unavailability of witnesses can arise any time there is a new trial, such risks are not of particular concern in the present case. The assaults at issue occurred in 2013, not in the distant past. This case does not turn on the testimony of eyewitnesses whose memories are likely to have faded with the passage of time. Neither Cedeno nor Harris was able to provide useful details as to the night they were shot. Harris, in fact, claimed that he was unable to remember any of the events of that night due to intoxication. Such an utter lack of recollection is not likely to worsen over time. Additionally, although it certainly is possible that a witness might be unavailable for a retrial, there is nothing in the record to suggest that any witness has died or left the jurisdiction of the state.

Finally, as we have discussed in part I of this opinion, the state's impropriety in immunizing Harris for future perjury, which the trial court expressly recognized but failed to prevent, violated public policy and undermines confidence in our judicial system. Although we recognize that reversal of a conviction is a remedy that should be invoked sparingly, we do not believe another viable solution exists here. The state has not made us aware of the availability of any other sanction, short of reversal, that will ensure that the egregious error that occurred in this case will not be repeated in the future.

The judgment is reversed and the case is remanded for a new trial.

In this opinion SHELDON, J., concurred.

[1] Although we ordinarily would not reverse a conviction on the basis of an unpreserved claim of error that was not raised by the parties on appeal, we have the discretionary authority to address, sua sponte, instances of error that are cognizable from the record and result in manifest injustice or constitutional error, provided that we give the parties an opportunity to be heard by way of supplemental briefing. See Practice Book § 60-5; *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 162 n.33, 84 A.3d 840 (2014). The parties here were provided with an opportunity to address fully both the claim of error and the appropriate remedy. The state has not argued that this court abused its discretion by raising the claim sua sponte or that it has been unfairly prejudiced by this procedure, except if we were to reverse the defendant's conviction pursuant to our supervisory authority over the administration of justice. Cf. *State* v. *Connor*, 321 Conn. 350, 374, 138 A.3d 265 (2016). We will address that claim of prejudice in this opinion. See part IV of this opinion.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The fabricated statement provided, in relevant part: "My best friend [the defendant] shot me while he was defending us from another guy who was trying to rob us. He had a gun too. I do not know the other guy who had the gun but he was a Spanish guy. I heard his name was 'Boobie'. My best friend name is Kevan Simmons, but everybody knows him as 'Low'. Low and I were chilling on Bedford Street when the dude tried to rob us for our money. We all started fighting on the stairs and the Spanish guy pulled out a gun. Low and I had found the gun Low had earlier that day.

"Low normally doesn't carry a gun, but like I said he found the gun that day. So when the Spanish guy walked up on us he said "give me all your money". We told him we didn't have any money and Low managed to grab him and we started fighting.

"I grabbed him too and that's when we pulled out a gun. Low stepped back and pulled out the gun we found and started shooting. Low hit me by accident and the Spanish guy got hit too. Low is a good guy and doesn't carry guns. He was protecting us and I respect him for that. The police should arrest the Spanish guy for trying to rob us.

"The detectives showed me some photos and I picked out a guy I know as Low. I have known Low for years. Low came back to the scene after he shot me because that's my boy and he cares about me. Low went to the hospital too. I am not mad at Low for shooting me by accident. I respect him for protecting me because that Spanish guy could have killed us. We didn't even have no money like that for him to be robbing us.

"That is all I have to say about me being shot. Kevan Simmons is Low and they call 'Deep'."

[4] The state filed with the court a document, signed by Gail P. Hardy, the Hartford state's attorney, partially memorializing the grant of immunity. It states: "Under [§ 54-47a], the Hartford State's Attorney's Office grants immunity from prosecution for George Harris for any alleged conduct directly or indirectly related to Hartford Case # 13-9934 and *State* v. *Kev[a]n Simmons*, Docket No.: HHD-CR13-0666536-T. The immunity shall be transactional immunity for the events on March 28, 2013, and use immunity—direct and derivative—for all other proceedings."

This memorialization does not appear to include the state's promise to immunize Harris from prosecution for any perjury he might commit while testifying at the defendant's trial.

[5] Although the jury was not shown the video at that time, the video was later shown to the jury and admitted into evidence as a full exhibit.

[6] See footnote 17 of this opinion.

[7] General Statutes § 53a-156 (a) provides in relevant part: "A person is guilty of perjury if, in any official proceeding, such person intentionally, under oath . . . makes a false statement, swears, affirms or testifies falsely, to a material statement which such person does not believe to be true."

[8] The record is unclear as to whether the court made the predicated findings required by the statute in order to permit a grant of immunity to the witness. Certainly, the remarks made by the court implicitly sanctioned the state's arrangement with Harris, and Harris testified in accordance with his agreement with the state.

[9] It is unclear, on the basis of the record presented, whether Harris testified

pursuant to an order issued directly under § 54-47a because the immunity agreement filed by the state with the court does not appear to be the byproduct of an application filed by the state with the court seeking an order compelling Harris to testify. Moreover, the court did not explicitly issue an order in the public interest or otherwise require Harris to testify pursuant to a particular grant of immunity. It would strain credulity, however, to imagine that the prosecutor could directly offer a witness immunity for perjury committed while providing immunized testimony if such a grant of immunity would be prohibited if ordered by the court pursuant to the procedures of § 54-47a.

[10] The Supreme Court of Delaware afforded an unlawful immunity agreement harmless error review in *Worthy* v. *State*, 120 A.3d 581, 586–87 (Del. 2015). In *Worthy*, the court concluded that the state failed to demonstrate that the error was harmless beyond a reasonable doubt. Id., 587.

[11] One example given by the court in *Gonzalez-Lopez* of structural error that may not necessarily result in demonstrable harm to a particular defendant but nevertheless warrants reversal are cases in which a defendant improperly is denied his right to self-representation, "a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant . . . ." (Internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 149 n.4.

[12] Even if the error in this case implicated only a statutory as opposed to a constitutional right of the defendant, the deprivation of that statutory right may also be so significant as to constitute structural error. For example, our Supreme Court has suggested, without explicitly deciding, that a court's noncompliance with a statute mandating that the jury be instructed regarding the defendant's constitutional right not to testify is structural error and not subject to harmless error analysis. *State* v. *Sinclair*, 197 Conn. 574, 584–86, 500 A.2d 539 (1985); see also *State* v. *Ruocco*, 322 Conn. 796, 805, 144 A.3d 354 (2016).

[13] Although we ultimately need not decide which party bears the burden of persuasion on this issue, we note that our Supreme Court has suggested that, although a party seeking to prevail pursuant to the plain error doctrine typically is obligated to demonstrate that it suffered a "manifest injustice," the state may still bear the burden of establishing harm if the underlying error was constitutional in nature. See *State* v. *Moore*, 293 Conn. 781, 823, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). In *Moore*, the court concluded that the defendant could not prevail under the plain error doctrine in circumstances in which the trial court failed to caution the jury to scrutinize carefully the testimony of an alleged accomplice. Id., 827. In reaching that conclusion, the court noted that because an instructional error relating to general principles of witness credibility " 'is not constitutional in nature' " the burden rested on the defendant rather than the state to demonstrate harm. Id., 824. This language strongly suggests that if the underlying error had been constitutional in nature, then the state would bear its usual burden of demonstrating harm beyond a reasonable doubt.

Adhering to this typical allocation of burden in the context of deciding claims arising under the plain error doctrine makes perfect sense and is not, as the state contends, "doctrinally incongruent." With respect to unpreserved errors arising during a criminal trial, the defendant may seek appellate review and to prevail either under the plain error doctrine or pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). If the claim is not of a constitutional nature, the defendant will typically be confined to the plain error doctrine because a party may prevail under *Golding* only if the claim is of a constitutional nature. If the defendant establishes a violation of a constitutional right, then the state is obligated to demonstrate, pursuant to the fourth prong of *Golding*, "harmlessness of the . . . constitutional violation beyond a reasonable doubt." Id., 240. Thus, most claims of plain error historically have not implicated a defendant's constitutional rights because of the availability of *Golding* review, and thus a defendant would properly bear the burden of establishing harm.

[14] We also recognize that, in assessing whether the error harmed the defendant, his written statement to the police was admitted into evidence. In that statement, the defendant allegedly admitted to the police that he shot Cedeno and Harris, but did so in self-defense. Importantly, however, the defendant substantially challenged the credibility of Detective Early, who obtained the defendant's statement, because of Early's creation of the fabricated written statement of Harris. Moreover, the defendant has raised

the additional claim on appeal that the state violated his rights by not disclosing, prior to trial, information regarding an internal affairs investigation of Early that would have yielded further evidence to undermine his credibility.

[15] None of the other witnesses at trial testified that the defendant shot Harris and Cedeno.

[16] Likewise, in *State* v. *Payne*, supra, 260 Conn. 446, our Supreme Court reversed a criminal conviction, holding that a new trial was warranted because of the prosecutor's repeated and deliberate misconduct during closing argument, which included appealing to the jury's emotions and improperly vouching for a prosecution witness' credibility. Although the court concluded that the prosecutor's misconduct did not violate the defendant's right to a fair trial in that particular case, it nonetheless exercised its supervisory authority "in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial" and "to send a strong message that such conduct will not be tolerated." (Internal quotation marks omitted.) Id., 452. Although the court in *Payne* identified a pattern of misconduct by the prosecutor spanning several cases, and stated that this pattern of misconduct was a significant factor in its decision to exercise its supervisory authority, it did not expressly hold that such a pattern of misconduct was a necessary requirement to the exercise of our supervisory powers. Moreover, any attempt to read such a requirement into its holding would thwart the standard it set forth, namely, that our supervisory powers must be flexible and that their application must be determined by the interest of justice. Id., 451; see also *State* v. *Rose*, supra, 305 Conn. 607.

[17] It is true, as the state contends, that there does not appear to be a record of repeated instances of impropriety by this prosecutor in other cases. Nevertheless, we reject the state's assertion that we should not exercise our supervisory powers because the impropriety in this case was not deliberate and the prosecutor in this case has not engaged in repeated instances of prosecutorial impropriety in other cases.

First, we are not exercising our supervisory powers in this case merely because of prosecutorial impropriety. Indeed, a large measure of our decision to do so is a result of the trial court's unwillingness to prohibit the arrangement entered into between the state and Harris. The trial court certainly appeared to recognize that the immunity agreement was improper when it stated on the record that the agreement was "probably against the public interest, but I didn't step in." Moreover, in our view, the prosecutor knew, or certainly should have known, that the agreement was unlawful. The need to obtain immunity for Harris was discussed during trial, and, in fact, a continuance was granted in order to allow the state to work out an immunity agreement. The prosecutor filed an immunity agreement with the court, which included a citation to § 54-47a, which he presumably had read. A review of that statute's plain language should have alerted the prosecutor that the scope of the immunity deal he offered to Harris at trial exceeded the authority provided for under the statute.

[18] The state in *Santiago* did not challenge our authority to exercise supervisory powers over the administration of justice. It also did not seek certification to appeal to our Supreme Court to challenge our decision on that basis.

[19] Footnote 11 of the majority opinion in *State* v. *Castillo*, supra, 329 Conn. 311, states: "A narrow and literal interpretation of the certified issue as limited to the question of whether the Appellate Court properly declined to exercise any authority it may have to issue the requested prophylactic rule would yield the bizarre result that if this court agreed with the defendant, it would remand the case to the Appellate Court with direction to exercise such supervisory authority. That narrow reading would constitute an improper abdication of this court's duty and authority over the administration of justice." Id., 335 n.11.